**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRITTANY CLAWSON,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:08cv1371 |
| | ) | **Electronic Filing** |
| **MICHAEL J. ASTRUE**, | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY**, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

February 12, 2010

## I.    INTRODUCTION

Brittany Clawson ("Plaintiff") brought the instant action pursuant to 42 U.S.C. §405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. According to the customary practice in the United States District Court for the Western District of Pennsylvania, the parties have submitted cross-motions for summary judgment.

After careful consideration of the determination of the Administrative Law Judge, ("ALJ"), the administrative record and the parties submissions, the Court finds that the decision of the Commissioner is supported by substantial evidence. Therefore, Plaintiff's motion for summary judgment, (Doc. No. 8), is DENIED and the Commissioner's motion for summary judgment, (Doc. No. 10), is GRANTED.

## II.    PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on November 7, 2005, alleging disability with an onset date of August 31, 2002. (R. at 46-49; 65). Her claim was initially denied on March 17, 2006. (R. at 33). Plaintiff filed a timely request for a hearing on April 27, 2006. (R. at 38). A hearing

1

was held on October 12, 2007 in Johnstown, PA. (R. at 535). Plaintiff appeared, with counsel, and testified. (R. at 538- 568).  Additionally, Plaintiff's husband, Brett Clawson, and an impartial vocational expert (the "VE") offered testimony. (R. at 568- 572; 572- 579).

By decision dated March 14, 2008, the ALJ found that Plaintiff was not disabled for the relevant time period. (R. at 12 - 20).  Plaintiff filed a request for review of the hearing decision with the Appeals Council which was denied on August 4, 2008, (R. at 5-8), making the ALJ's decision the final determination of the Commissioner.

Plaintiff filed a Complaint in this Court on October 7, 2008. She thereafter filed a motion for summary judgment, and brief in support, on February 9, 2009.  The Commissioner filed a cross-motion for summary judgment and brief in support on March 10, 2009.

## III.   STATEMENT OF THE CASE

Plaintiff was twenty-three (23) years old at the time of her alleged onset date of August 31, 2002. (R. at 46; 539).  On the date of the administrative hearing, Plaintiff was twenty-eight (28) years old. *Id*.  She is a high school graduate and holds an associate's degree in psychology. *Id*. At the time of the administrative hearing, Plaintiff lived with her husband and father-in-law. *Id*.  Plaintiff's work experience includes that of a mental health direct care worker. (R. at 79). Plaintiff worked for Northwestern Human Services from April 2000 to August 2002.  On June 18, 2001 Plaintiff was injured when she was "head-butted" by an autistic client in the course of her employment. (R. at 54).

Plaintiff testified that she attempted to return to work in 2002, but was unable to maintain even a lightened schedule because of pain. *Id*.  She also testified that her employer eventually informed her that there was no longer light duty work for her. (R. at 543-544).  Plaintiff likewise testified that she attempted to find work through placement agencies but remained unable to do so as a result of her allegedly disabling condition. (R. at 544-545).

In regard to her ability to function on a daily basis, Plaintiff testified that she drives only short distances, no longer than two or three minutes from her house, because of neck spasms. (R. at 552).  She also testified that she has a hard time concentrating because of the pain. (R. at

555-556).   She indicated that she has to take breaks in her activity regularly in the course of the day. (R. at 558). She testified that she goes shopping and grocery shopping by herself, but has someone else load and unload the bags from the car. *Id*.  According to Plaintiff, her pain is worse in rain and cold weather. *Id*.

Plaintiff testified that she cannot walk for long periods of time.  *Id.* She stated that she can walk for 15 to 20 minutes before she becomes achey. *Id*.  Specifically, she testified that  her neck will tighten and cause her to have headaches. (R. at 560). She also stated that she gets pain sitting. (R. at 561). According to Plaintiff, she can dress and bathe herself but has difficulty with things that require her to hold her arms, such as drying her hair. (R. at 562). She testified that she can comfortably lift or carry five pounds. *Id*. She said she can occasionally stoop, squat or kneel. *Id.* She indicated that she can occasionally help out with washing dishes or folding clothes, but often has to spread several tasks over several days. (R. at 564).

According to Plaintiff's testimony,  she is no longer able to go fishing, bowling or take part in other outside activities. (R. at 565).  She testified that she avoids crowds as she becomes anxious which causes her neck to tense. (R. at 565-566). She stated that she cannot sit through a movie. (R. at 567). She testified that she has not had children because she is concerned with lifting the weight. *Id*.

The record medical evidence includes extensive treatment notes and records from: Dr. Eric Fishman, PhD.; Michael Rutigliano, M.D.; Westmoreland Regional Hospital; Dr. Larry Plundo; Laurel Highlands Health Center; The Physical Therapy Group; Dr. Michael Sauter, M.D.; Westmoreland Primary Health Center; William Hafer, D.C;. and Dr. Michael Toshok, D.O.  Additionally, Plaintiff's medical evidence includes examination records of Dr. Victor Jabbour, M.D., a consultative examiner. (R. at 33).

<u>Westmoreland Regional Hospital/Dr. Larry Plundo, M.D.</u>

Plaintiff was seen by Dr. Larry Plundo, M.D., in the emergency room at Westmoreland Regional Hospital with complaints of a migraine headache on February 18, 2002. (R. at 140). She was treated with Demerol. *Id.* Dr. Plundo diagnosed Plaintiff with acute cephalgia, likely a migraine versus tension headache. (R. at 141). She was prescribed Vicodin on discharge. *Id.*

3

Plaintiff was treated against at the emergency room by Dr. Plundo on May 1, 2002. (R. at 138). She complained of diffuse headache, which developed ten days prior to her arrival. *Id.* She was diagnosed with a headache and prescribed Percocet on discharge. (R. at 139). Plaintiff presented to the emergency room again on May 21, 2002. (R. at 136). She was diagnosed with acute cephalgia and treated with Demerol, Phenergen and Norflex. (R. at 137). She had improved on reexamination. *Id.*

Plaintiff was seen again at the emergency room on June 21, 2002, with complaints of a headache. (R. at 134). She was treated with Depakote, which did not relieve her symptoms. *Id.* She was treated with Demerol. *Id.* Plaintiff was advised to follow up with her physician. (R. at 135). Plaintiff was seen in the emergency room on August 3, 2002, with complaints of a headache. (R. at 132). A neurologist, Dr. Sauter,  was consulted and recommended Depakote. (R. at 133). Plaintiff was discharged with a prescription for Vicodin. *Id.* On August 11, 2002, Plaintiff presented to the emergency room with chest pressure, pounding heartbeat and difficulty breathing. (R. at 130).She was diagnosed with chest pain, palpitations and high blood pressure, potentially related to use of pain medication. (R. at 130-131). Plaintiff was advised to discontinue use of Ultram and prescribed Vicodin. (R. at 131).

Plaintiff was seen in the emergency room several times in 2003. (R. at 201). On February 4, April 17, May 25 and December 20, 2003, Plaintiff was treated for headache and neck spasms and pain with various pain medications. (R. at 210-219). Plaintiff presented to the emergency room on June 22, 2004, complaining of a four day history of neck spasm. (R. at 243). She was noted as having cervical muscle spasm and a muscle tension headache. *Id.* She was treated with Norflex and prescribed Flexiril on discharge. (R. at 243-244).

<u>Dr. Michael Rutigliano, M.D.</u>

Plaintiff was seen by Dr. Michael Rutigliano, M.D., a neurosurgeon, on July 31, 2001. (R. at 146). On examination, Dr. Rutigliano noted that Plaintiff held her neck in a rigid posture with minimal motion. (R. at 146). She exhibited pain to palpations and percussions of the neck as well as significant paraspinous spasm. *Id.* Her range of motion in her neck was reduced in all fields, but particularly extension. *Id.*

4

Dr. Rutigliano's records indicate that Plaintiff had a cervical fusion performed on October 8, 2001. (R. at 145).  On follow-up examination in February 2002, he noted that Plaintiff had no significant neck pain, but had some discomfort in her left arm and shoulder that appeared to be muscular. *Id.*  He also noted that Plaintiff neurological examination remained normal and her x-rays looked "quite good with increasing evidence of a solid fusion." *Id.* He indicated that, at that time, she had improved enough to return to work at a light duty level. *Id.* He also prescribed continued physical therapy and indicated that he would like to see a functional capacity evaluation. *Id.*

Plaintiff was seen again by Dr. Rutigliano on September 24, 2002. (R. at 144).  He noted that Plaintiff had done reasonably well with respect to back pain, but had developed significant headaches. (R. at 144).  He noted that she had been treated with a variety of medications for headaches, without significant benefit. *Id.*  He also noted that cervical spine x-rays showed a solid fusion at C5-6. *Id.*  Plaintiff reported some degree of neck pain, but her major complaints were related to headaches. *Id.* He referred her to Dr. Michael Toshok, a pain management specialist and recommended continued treatment with Dr. Sauter in regard to her headaches. *Id.* At this time, Dr. Rutigliano maintained her work status of sedentary to light, but indicated that he would "defer it to those physicians primarily responsible for her headache syndrome" if said became limiting. *Id.*

Plaintiff saw Dr. Rutigliano for follow-up on June 30, 2004. (R. at 143).  At this time, he indicated that it was his impression that Plaintiff had significant neck pain, muscle spasm and muscle tension headaches. *Id.*  He indicated that he would prefer not to treat with a spinal cord stimulator, due to her young age and the stress of litigation pertaining to her injuries. *Id.*

The Physical Therapy Group

In December 2001, Dr. Rutigliano prescribed physical therapy as treatment for her neck pain. (R. at 129; 114). Plaintiff attended physical therapy appointments numerous times between December 18, 2001 and March 25, 2002. (R. at 107-125).  At her initial treatment, the physical therapist noted that Plaintiff's chief complaint was muscle spasms in her upper trapezii region on the left. (R. at 114).  He noted that Plaintiff had a well healed posterior cervical incision. *Id.*  Her

5

neck posture was generally good and active range of motion of the upper extremities was within normal limits and pain free. *Id.* He likewise noted cervical spine range of motion was within normal limits, with limitations in extension and side bending. *Id.* On examination, tests for focal strength deficit was negative and postural musculature testing revealed 4/5 strength. *Id.* The physical therapist noted myofascial tightness throughout the cervicothoracic musculature with reported tenderness in the right upper trapezius. *Id.*

On January 3, 2002, the records indicate that Plaintiff reported increased flexibility , but stiffness overnight. (R. at 124). She reported the same on January 2, 2002. (R. at 123).  On January 10, 2002, the records indicate that Plaintiff had no new complaints. (R. at 122).  She reported that on January 14, 2002, she engaged in ten minutes of aerobic activity without difficulty. *Id.* On January 16, 2002, Plaintiff noted definite improvement in cervical mobility and improved tolerance for exercise.  *Id.* The treatment notes from this date also indicate that Plaintiff was making steady progress toward her treatment goals. *Id.*

On January 17, 2002,  Plaintiff reported significant muscle spasm and pain which progressed to a  migraine headache  after the treatment the previous day. (R. at 121).  The therapist indicate that increased tightness and tenderness was perhaps due to increase in the program. *Id.* Plaintiff reported no new complaints on January 21, 2002 and muscle spasms on January 23, 2002. (R. at 120).  On January 24, 2002, Plaintiff reported that she felt much better after hot tub and massage. *Id.* She reported that spasms in her upper trapezius had decreased significantly. *Id.*

In February, 2002, Plaintiff noted increased and severe pain at several physical therapy sessions. (R. at 110).  The treatment records indicate that Plaintiff was attempting to work four hours per day at light duty during the week of February 4 and experienced pain, that did not improve with trigger point treatment. (R. at 110).  On February 11, 2002, Plaintiff reported that she was beginning to tolerate work activities better, but had increased soreness about three and a half hours into her four hour work shift. *Id.*

On February 18, 2002, Plaintiff's physical therapist indicated that treatment goals included progressing toward a more active exercise program to improve strength and endurance

so that Plaintiff could perform full work activities. (R. at 117). Plaintiff reported a migraine headache, which required her to have injections and miss work. *Id.* She noted a headache from typing activities and that she would be returning to a full eight hour work day in early March of 2002. *Id.*

Plaintiff cancelled two appointments in early March. (R. at 115). On March 6, 2002, Plaintiff cancelled due to severe muscle spasms, which required her to seek treatment at the emergency room. *Id.* On March 11, 2002, Plaintiff reported that she developed a migraine headache secondary to spasms in her paracervical and suprascapular areas. *Id.* On March 31, 2002, she reported that she had moderate muscle spasms and did not return to work. *Id.*

On March 19, 2002, Plaintiff's physical therapist performed a functional capacity evaluation, per Dr. Rutigliano's request. (R. at 108). Subjectively, Plaintiff reported symptoms of achiness along her cervical spine, tightness bilaterally in the suprascapular area, burning along the right paravertebral cervical spine and tightness along the medial border of both scapulae. (R. at 109). She reported her pain at 6 on a scale of 10, with 3 being the best in the past 30 days and 10 at its worst. *Id.* After testing, Plaintiff indicated her pain was an 8-9 out of 10. *Id.*

On examination, the therapist noted that Plaintiff maintained a fetal type posture about her upper quarter with her head forwarded and rounded shoulders. *Id.* He noted muscle spasms and guarding bilaterally along the suprascapular area. *Id.* Her range of motion of all four extremities was within normal limits. *Id.* Strength of both shoulder girdles was 4/5. Strength in her remaining upper and lower extremities was 5/5. *Id.* Her range of motion of the cervical spine was limited in forward flexion at end range, extension was half of full range, rotation to the right was half of full range and rotation to the left was three-quarters of full range. *Id.* Movement in the cervical spine was slow and guarded. *Id.* Range of motion in the trunk showed forward flexion with a reach to one third of the shin and extension and rotation were all within normal limits. *Id.* Truncal movements were performed fluidly free of any antalgic posturing. *Id.*

The physical therapist noted that Plaintiff transferred from sitting to standing and ambulated while maintaining rigid posture in her upper quarter. *Id.* He also noted that she was able to remain seated during the interview and paperwork portion of the exam for longer than

forty-five minutes and tolerated standing at thirty minute intervals. *Id.*

Plaintiff's therapist indicated that, on examination, Plaintiff was able to perform tasks in the sedentary to light level of work. (R. at 110).  He recommended a detailed work-conditioning program and entrance into a formalized work hardening program. Plaintiff was formally discharged from her physical therapy program on March 25, 2002. (R. at 107).

Dr. Michael Sauter, M.D.

Plaintiff was treated for headaches by Dr. Michael Sauter, M.D., a neurologist, several times in 2002 and 2003. (R. at 195- 200). On June 27, 2002, Plaintiff complained chiefly of headaches. (R. at 199).  On examination, Dr. Sauter noted that Plaintiff's extraocular movement was intact and her visual fields were full.  She showed 5/5 motor power bilaterally in the upper and lower extremities. (R. at 200).  He indicated that Plaintiff suffered from post traumatic vascular headaches and cervical spondylosis. *Id.*  He prescribed Zoming as needed for headaches, Elavil and Robaxin as needed for neck spasms.  *Id.*  On December 30, 2002, Dr. Sauter again noted that Plaintiff had full visual fields, extraocular movement was intact and Plaintiff had 5/5 motor power bilaterally. (R. at 197).  She was referred to the pain clinic and to physical therapy. (R. at 197).  She was encouraged to restart Soma or Robaxin as needed for neck spasms. *Id.*

On June 5, 2003, Dr. Sauter noted that Plaintiff's cranial nerve, motor exam and sensory exam were intact. (R. at 196).  He noted that Plaintiff continued to use MS Contin daily, as prescribed by Dr. Toshok. *Id.*  Dr. Sauter cautioned Plaintiff to avoid daily use of said to avoid the risk of tolerance. *Id.*  On November 5, 2003, Dr. Sauter noted that extraocular and hearing were intact and motor power was 5/5 bilaterally. (R. at 195).  He opined that Plaintiff was experiencing daily chronic tension headaches. *Id.* He recommended that she discontinue use of daily analgesic medication and consider chronic antidepressant therapy for pain management. *Id.*

Laurel Highlands Health Center

Plaintiff received physical therapy treatments at Laurel Highlands Health Center in March of 2003. (R. at 149-150).  The treatment records from indicate that Plaintiff received a month of aquatic therapy. Her pain decreased slightly to a 9 out of 10. (R. at 151).  Her therapist indicated that she felt better in the water, but felt her pain come back after. *Id.*

Dr. Patricia Jozefczyk, M.D.

On referral from Dr. Plundo, Plaintiff was seen by Dr. Patricia Jozefczyk, a neurologist at Allegheny Neurological Associates, on April 7, 2003, regarding her headache syndrome. (R. at 155). Dr. Jozefczyk noted that Plaintiff had normal gait, sensory examination and reflexes. (R. at 157). She also noted that Plaintiff held her head rigidly, but had a full range of motion. *Id.* She noted that Plaintiff grimaced with pain with any neck movement or palpation. *Id.* She indicated that there was no paravertebral muscle spasm. *Id.* Plaintiff complained of pain with light touch over the forehead, vertex, temples and occipital scalp. *Id.*

Dr. Jozefczyk indicated that Plaintiff had a plate and screw at C5-6 level, on review of Plaintiff's x-rays, but also noted good flexion and extension and normal cervical alignment. *Id.* She reviewed a cervical MRI of March 6, 2003, which indicated no significant abnormalities. *Id.* She noted no disc herniation and normal spinal cord. *Id.*

Dr. Jozefczyk indicated that she could find no anatomical explanation for Plaintiff's continued pain. *Id.* She recommended that Plaintiff be evaluated in a multi-disciplinary pain center, which would include psychological evaluation and support as well as pain management and control. *Id.* Dr. Jozefczyk opined that some of Plaintiff's pain was likely due to overuse of analgesic medications. *Id.* She recommended discontinued use of all analgesic medications, use of prophylactic medication for pain control and support from nursing and psychological staff in a pain center. *Id.*

Dr. Michael Toshok, D.O.

Plaintiff was referred to Dr. Michael Toshok, M.D., a pain management specialist, by Dr. Rutigliano and seen on November 4, 2002. (R. at 173). At this time, Dr. Toshok noted that Plaintiff had done well with her posterior cervical fusion at C5-6. *Id.* He also noted persistent headaches, with no relief from treatment including opiates and beta blockers. *Id.* He recommended initiating Celebrex and then Bextra if Celebrex provided no benefits. *Id.*

Dr. Toshok injected Plaintiff with cervical facet blocks on November 27, 2002 for headaches. (R. at 172). He noted that Celebrex gave marginal benefits and prescribed Bextra instead. *Id.* Dr. Toshok performed a cervical epidural steroid injection on December 4, 2002. (R.

at 171). On that date and again on January 8, 2003, he recommended aqua therapy. (R. at 170-171). Dr. Toshok also treated Plaintiff with a Duragesic patch. (R. at 167-171).  On February 5, 2004, he performed an occipital nerve block. (R. at 167). On March 5, 2003, Dr. Toshok noted moderate pain over the occipital nerve, bilaterally and generalized sensitivity to palpation through the temporal area. (R. at 166). He noted that the occipital nerve block provided temporary relief for her headaches. *Id.* He increased her Duragesic patch and ordered an MRI. *Id.* In April 2003, Dr. Toshok discontinued the Duragesic patch and over the next several months treated Plaintiff with MS Contin, Bextra and Skelaxin. (R. at 159- 165).

Dr. John Moossy, M.D.

Plaintiff was evaluated by Dr. John Moossy on May 21, 2003, regarding her headaches. (R. at 178). He noted that Plaintiff did not bring any imaging studies with her to the examination. *Id.* He recommended possible use of cervicomedullary spinal cord stimulator as treatment, after reviewing the results of imaging studies. *Id.*

Plaintiff saw Dr. Moossy again on September 10, 2003. (R. at 177). He recommended that she consider an MRI of the brain before the possibility of treatment with the stimulator for pain control. *Id.*

Dr. Eric Fishman, PhD.

Plaintiff was referred to Dr. Eric Fishman, PhD., a neuropsychologist, by Dr. Moossy. (R. at 181).  Dr. Fishman interviewed Plaintiff on September 5, 2003 and completed neuropsychological testing on September 19, 2003. *Id.*  Plaintiff saw Dr. Fishman for follow-up on October 3, 2003. *Id.*

Dr. Fishman's test data showed intact cognitive/ behavioral test performance, indicating lack of cerebral injury and/or illness. (R. at 184).  He indicated that some weakness in response inhibition, phonemic verbal fluency and numerical reasoning were likely pre-injury weaknesses. *Id.* He opined that Plaintiff's cognitive and behavioral complaints were most likely reflecting issues other than frontal lobe injury, such as post-traumatic stress, depression, chronic pain and medication side effects. *Id.*

He recommended continued treatment of post-traumatic stress symptoms, depression and

chronic pain. (R. at 185).  He also recommended a gradual return to employment and/or school activities. *Id.*

Dr. Victor Jabbour, M.D.

Plaintiff had a consultative examination performed by Dr. Victor Jabbbour, M.D. on January 27, 2006. (R. at 318). On examination, Dr. Jabbour noted that Plaintiff was conscious, alert and oriented to place, person and time. (R. at 320).  He also noted  mild tenderness over the lumbosacral spine area, but there was no limitation of lumbosacral spine movement. (R. at 321). He indicated that Plaintiff cranial nerves, motor system and sensation on touch, pain, vibration and position were within normal limits. *Id.* Likewise, coordination was within normal limits. *Id.* Dr. Jabbour noted that Plaintiff's range of motion was within normal limits, with the exception of mild limitation of the cervical spine movement. *Id.*  Motor power and reflexes were normal. *Id.* No muscle atrophy was noted. *Id.* Straight leg tests, both seated and supine, were normal. *Id.* Plaintiff's fine and dextrous movement was normal. *Id.*  Likewise, gait and neurologic status was normal. *Id.* Dr. Jabbour diagnosed Plaintiff with headaches secondary to posttraumatic injury and neck pain secondary to arthritis and possible disc disease. *Id.*

He completed a medical source statement, which indicated that Plaintiff would be able to lift and carry two to three pounds frequently and ten pounds occasionally. (R. at 323).  He opined that Plaintiff could stand and walk one or less hours per day and sit less than six hours. *Id.* He indicated that Plaintiff would have no limitations in pushing and pulling and would occasionally be able to perform postural activities, including bending, kneeling, stooping, crouching, balancing and climbing. (R. at 324).

Dr. Emilio Navarro, M.D.

Plaintiff saw, Dr. Emilio Navarro, M.D., a pain management specialist, several times between April 2002 to October 2007. (R. at 334-523).  During his examinations of Plaintiff, Dr. Navarro noted cervical radiculopathy, degenerative disc disease, chronic headaches and chronic back and neck pain. (R. at 388-393; 396- 398; 400 ; 403- 404; 406-409).  Plaintiff reported extreme sharp, burning and throbbing pain,  usually at 7 or higher on a scale to 10, but ranging anywhere from 1 to 10. (R. at 389, 392, 395, 399, 403, 405, 411). She was treated with occipital

11

nerve blocks. (R. at 397; 401; 410; 415).  A letter from Dr. Navarro dated July 10, 2007 stated that he treated Plaintiff numerous times in regard to her work related injury of June 18, 2001. (R. at 334).  He diagnosed Plaintiff with cervical radiculopathy, failed back syndrome, chronic myofascial pain and cervicalgia. *Id.*  Dr. Navarro opined that Plaintiff's prognosis is poor. *Id.* "Her condition is continually deteriorating and she is unable to perform any and all forms of gainful employment. Her condition will progressively worsen and therefore affects [sic] all activities of daily living. She is disabled and will remain this way indefinitely."  *Id.*

IV.   STANDARD OF REVIEW

When reviewing a decision denying DIB, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact.  *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).  Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  In reviewing the record for substantial evidence, the district court does not weigh the evidence or substitute its own conclusions for those of the fact finder. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir.2005). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

V.   DISCUSSION

Under the Social Security Act, an individual is considered disabled when she is:

unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. ...

42 U.S.C. §423(d)(1)(A); 20 C.F.R. §404.1505.

When resolving the issue of whether a claimant is disabled within the meaning of the Social Security Act, the Commissioner utilizes a five-step sequential evaluation process. 20 C.F.R. §404.1520. The process is summarized as follows:

> If at any step of a finding of non-disability can be made, the [Commissioner] will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that [she] is not working at a "substantial gainful activity." §§404.1520(b), 416.920(b). At step two, the [Commissioner] will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment of combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities. §§404.1520©, 416.920©. At step three, the agency determined whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [Commissioner] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the [Commissioner] to consider so-called "vocational factors" (the claimant's age, education and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§404.1520(f), 404.1560©, 416.920(f), 416.960©.

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

Here, the ALJ applied the five-step sequential evaluation process and made the following findings: (1) the Plaintiff was not engaged in substantial gainful activity during the period from her alleged onset date of August 31, 2002 through her date of last insured on December 31, 2007; (2) the Plaintiff suffered from the following severe impairments through the date of last insured: cognitive deficit from past injury; headaches; and cervical spine degenerative disc disease with arthritis; (3) none of the claimant's impairments or combination of impairments met or medically equaled one of the listed impairments; (4) Plaintiff was unable to perform past relevant work through the date of last insured; and (5) considering the vocational factors[1] set forth in the

---

[1]

In regard to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff is able to perform work at the sedentary level with the following additional limitations: that she be limited to occasional postural maneuvers, such as stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, and scaffolds. (R. at 15). "Sedentary work" is defined as work that:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined

Regulations, there are jobs existing in significant numbers in the national economy that Plaintiff can perform. (R. at 17-19).

Plaintiff's motion challenges the ALJ's determination at step five of the sequential evaluation process. (Doc. No. 9 at 4-13). Specifically, Plaintiff argues that the ALJ's residual functional capacity is not supported by the opinions of either the consultative examiner or her treating physicians and must therefore be reversed and benefits granted, or remanded in order to clarify the ALJ's conclusions. (Doc. No. 9 at 16).

Plaintiff argues that the ALJ failed to properly consider the opinions of Dr. Jabbour, the consultative examiner, in making her residual functional capacity determination. (Doc. No. 9 at 7-10). According to Plaintiff, the ALJ erred in her determination that Dr. Jabbour's report placed Plaintiff at the sedentary work level. (Doc. No. 9 at 7). Rather, Plaintiff argues, Dr. Jabbour's opinions reflect that Plaintiff was unable to work at any level during the relevant time period. (Doc. No. 8-9). Moreover, Plaintiff argues, the ALJ's disability determination is in direct contravention to the ALJ's own statement that Dr. Jabbour's opinion was given "great weight" in making her determination. (Doc. No. 9 at 14). Indeed, Plaintiff argues, had the ALJ actually accord Dr. Jabbour's opinion said weight, the evidence would support only a finding that Plaintiff was unable to work an eight hour day through the date of last insured. (Doc. No. 9 at 15).

Plaintiff likewise argues that the ALJ failed to properly consider the record medical evidence from Plaintiff's treating physicians, particularly Drs. Navarro and Plundo. (Doc. No. 9 at 10). Specifically, Plaintiff contends that the ALJ erroneously ignored Dr. Navarro's July 10, 2007 opinion that Plaintiff was disabled and would remain so indefinitely. (Doc. No. 9 at 10). Plaintiff further argues that the ALJ failed to give proper credit to the medical records provided

---

as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §404.1567.

by Dr. Plundo, indicating that Plaintiff's headaches were debilitating to the extent that she would not be capable of returning to work. (Doc. No. 9 at 11).

"'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Commissioner*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n. 1 (3d Cir. 1999)). *See also Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001).   In making a residual functional capacity determination, an ALJ is required to consider all relevant evidence.  *Fargnoli*, 247 F.3d at 41; *Burnett*, 220 F.3d at 121.  This evidence "includes medical records, observations made during formal medical examinations, description of limitations by the claimant and others, and observations of the claimant's limitations by other."  *Id*. (citing 20 C.F.R. §404.1545(a)). Moreover, the ALJ is required to consider all of a claimant's impairments, both severe and non-severe.  20 C.F.R. §404.15459(a)(2).  In making her determination, the ALJ is required to give a "clear and satisfactory" explanation of the basis upon which his or her determinations rest. *Fargnoli*, 247 F.3d at 40 (citing *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1982)).

In regard to the medical evidence of record, the ALJ is required to "consider, discuss and weigh relevant medical evidence."  *Id*. at 42 (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 406-07 (3d Cir. 1979)).   Likewise, the ALJ is required to explain her assessment of the credibility of and weight given to medical opinions of a claimant's treating physicians. *Id*. at 40. The ALJ may not, in considering the medical evidence, make "speculative inferences" from the medical reports. *Plummer*, 186 F.3d at 429 (citing *Smith v. Califano*, 736 F.2d 968, 972 (3d Cir. 1981)). Moreover, the ALJ may not "employ her own expertise against that of a physician who presents competent medical evidence." *Id.* (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).

In considering the records from the consultative examination performed by Dr. Jabbour and his medical source statement, the ALJ noted that Dr. Jabbour diagnosed Plaintiff with headaches secondary to post-traumatic injury and beck pain secondary to arthritis and possible disc disease. (R. at 17).  He also noted that Dr. Jabbour, on examination, reported range of motion within normal limits, with only mild limitation of cervical spine movement. *Id*.  He also noted that sensation, motor power and reflexes were normal.  *Id*.  The ALJ noted that Dr.

15

Jabbour's report indicated that Plaintiff had no atrophy and straight leg raising, tested both seated and supine, were normal. *Id.*

The ALJ's determination states:

> Because Dr. Jabbour's opinion that places the claimant at the sedentary exertional level is more consistent with the evidence as a whole it is afforded greater weight than the opinion of the State Agency consultant which placed the claimant at the light exertional level.

(R. at 17).

Plaintiff argues that the ALJ's determination is in direct contravention to Dr. Jabbour's actual opinions in his medical source statements. Indeed, Plaintiff argues that while the ALJ purportedly assigned "great weight" to Dr. Jabbour's opinions, records from Dr. Jabbour "clearly establish" that he was of the opinion that Plaintiff could not do sustained work activities in an ordinary setting on a regular and continuing basis, *i.e.*, eight hours a day, for five days a week. Plaintiff's primary argument is that the ALJ clearly did not consider Dr. Jabbour's medical source statement wherein he checked that Plaintiff would be able to sit less than six hours a day and stand less than one hour a day. Plaintiff contends that Dr. Jabbour's opinion indicates that, as a result, Plaintiff would be unable to work an eight hour day.

The Court finds Plaintiff's argument to be without merit. As a threshold matter, ALJ is "not bound by any findings made" by a consultative examiner. 20 C.F.R. §404.1527. However, said examiners are "highly qualified physicians" and, therefore, the ALJ must consider their findings as opinion evidence, "*except* for the ultimate determination about whether [the claimant] is disabled." *Id.* (citing 20 C.F.R. §404.1512(b)(6)) (emphasis added); *See also* SSR 96-6p, 1996 WL 374180 at * 1-2 (S.S.A. 1996). An opinion expressed by an examining physician on a matter reserved for the Commissioner, such as a conclusion that the claimant is "disabled" or "unable to work" is neither dispositive nor controlling. *Adorno v. Shalala*, 40 F.3d 43, 47-8 (3d Cir. 1994) (citing *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990)). *See also* 20 C.F.R. §404.1527(e)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability ... A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are

16

disabled").   Rather, "[t]he ALJ must review all the medical findings and other evidence presented in support of the attending physician's opinion of total disability." *Id.* (citing *Wright*, 900 F.2d at 683). Likewise, the task of determining a claimant's residual functional capacity is reserved for the ALJ, after he has evaluated the record evidence regarding Plaintiff's impairments and functional limitations.  20 C.F.R. §§404.1546©, 416.946( c).  While the ALJ is required to consider opinions from treating and examining medical sources in determining a claimant's residual functional capacity, the ultimate determination is reserved to the Commissioner. *Id.* Thus, while the ALJ was required to consider the record medical evidence, including Dr. Jabbour's medical opinions, in making his residual functional capacity determination, he was not required to consider Dr. Jabbour's opinions on a matter reserved to him, *i.e.*, Plaintiff's  residual functional capacity or ultimate disability determination. *Id.*; *See Schwartz v. Halter*, 134 F.Supp. 2d 640, 650 (E.D. Pa. 2001)  Indeed, in his determination the ALJ clearly made a residual functional capacity assessment and determined, from the record of Dr. Jabbour's examination, Plaintiff could perform work at the sedentary level. (R. at 17). While Plaintiff's argument seems to suggest that Dr. Jabbour opined that Plaintiff could not perform work on a regular and continuing basis, *i.e.*, she is disabled, assuming Dr. Jabbour made such an opinion, the ALJ was not required to consider that in his determination. *Id.*

Furthermore, Plaintiff's complaint focuses on not on Dr. Jabbour's examination notes, but on the form portion of the medical source statement that required him to check a box.  The United States Court of Appeals for the Third Circuit has held that such "check the box" forms are "weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

Notwithstanding the above, the Court finds that the objective records from Dr. Jabbour's examination of Plaintiff are consistent with the ALJ's finding that Dr. Jabbour did, indeed, indicate that Plaintiff could engage in sedentary work.

As noted above, sedentary work:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if

walking and standing are required occasionally and other sedentary criteria are
met.

20 C.F.R. § 404.1567(a).

Records from Dr. Jabbour's examination of Plaintiff are consistent with the ALJ's
evaluation of said records.  In turn, examination records support the ALJ's residual
functional capacity determination. On examination, Dr. Jabbour noted that Plaintiff had
mild tenderness over the lumbosacral spine area, but no limitation in lumbosacral spine
movement. (R. at 321).  Moreover, he indicated that Plaintiff's motor system and
sensation on touch were within normal limits. *Id*.  Plaintiff's range of motion was within
normal limits, with the exception of mild limitation in cervical spine movement. *Id*.  He
also indicated that straight leg tests, both seated and supine, were normal.  *Id*.  Gait and
neurologic status were normal. *Id*. Moreover, in his medical source statement form, he
checked that Plaintiff would be able to lift and carry two to three pounds frequently and
ten pounds regularly.  (R. at 323).  Given the requirements of sedentary work, his opinion
is consistent with a finding that Plaintiff would be capable of sedentary work.
Furthermore, he noted that Plaintiff would be able to sit for six hours and walk for one
hour.  *Id*.  A finding that Plaintiff would be able to sit for long periods of time, with
occasional walking and standing is supported by Dr. Jabbour's opinions.[2]

For the foregoing reasons, the Court finds that the ALJ accorded proper weight to
Dr. Jabbour's opinions and his findings in regard to said opinions are supported by the
record medical evidence.

---

[2]

Furthermore, the Court notes that Dr. Jabbour's check the box statements do not indicate that
Plaintiff would not be able to work eight hours a day because she could sit for six or less and stand
for one or less hours.  Rather, his opinion suggests that Plaintiff would be capable of sitting for
longer periods of time, with the ability to stand occasionally, but without lengthy periods of standing
and walking. (R. at 323-324).  Moreover, Dr. Jabbour's check the box form does not include support
for his specific opinions.  *See Mason*, 994 F. 2d at 1065.  However, his objective assessment on
examination support a determination that Plaintiff would be able to perform work at the sedentary
level.

Plaintiff further argues that the ALJ erred in failing to accord proper weight to the opinions of Plaintiff's treating physicians, particularly Dr. Navarro and Dr. Plundo. (Doc. No. 9 at 10).

The United States Court of Appeals for the Third Circuit subscribes to the "treating physician doctrine," which requires us to "give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993); *Adorno*, 40 F.3d at 47 (holding that "greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant"). "Opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli*, 247 F.3d at 43 (citing 20 C.F.R. §404.1527(d)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). A treating physician's opinion will be afforded "great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the [claimant's] condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429) (citations omitted)). A treating physician's opinions will be accorded controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli*, 247 F.3d at 42.

In regard to Dr. Navarro, Plaintiff specifically contends that the ALJ failed to give proper weight to Dr. Navarro's opinion that Plaintiff is unable to work and would remain so because her prognosis is poor. (Doc. No. 9 at 10). The ALJ, in considering said opinion, noted that Dr. Navarro's treatment notes contained Plaintiff's subjective complaints of pain and a rating of the severity of her pain with no objective evidence to support his assertions. (R. at 17-18). The ALJ also noted that the ultimate disability determination is reserved to the Commissioner. (R. at 18).

The Court finds that the ALJ gave adequate weight to Dr. Navarro's opinions. As discussed above, the ALJ was not required to consider Dr. Navarro's opinion concerning Plaintiff's disability determination. *See Adorno*, 40 F.3d at 47-8 (3d Cir. 1994) (citing *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990)). Furthermore, in reviewing the record, the Court

likewise notes that Dr. Navarro's treatment records contain no specific objective records, from his examinations or tests indicating that Plaintiff suffered from disabling impairments.  Rather, as the ALJ noted, records from Dr. Navarro show Plaintiff's subjective reports of pain. (R. at 18).  They also show that Plaintiff was treated by Dr. Navarro with occipital nerve blocks.  (R. at 397-425). Because the ALJ's findings in regard to Plaintiff's functional limitations are supported by substantial evidence elsewhere in the administrative record, these treatment records alone do not support Plaintiff's position.

With regard to Dr. Plundo, Plaintiff argues that the ALJ failed to properly consider his opinion that Plaintiff had severe and debilitating headaches and was not capable of returning to work. The Court likewise finds this argument unpersuasive.  Again, while the ALJ was required to accord great weight to Dr. Plundo's opinions as Plaintiff's treating physician, *Fargnoli*, 247 F. 3d at 43, he was not required to consider Dr. Plundo's opinion in regard to whether or not Plaintiff is disabled, a matter reserved to the Commissioner. *Mason*, 994 F. 2d at 1065. The ALJ considered treatment notes from Dr. Plundo's treatment of Plaintiff in December 2003 at Westmoreland Regional Hospital's emergency room for a headache. (R. at 17).  The ALJ noted that, each time Plaintiff presented to the emergency room with complaints of a headache, her treating physician noted treatment with various sources and no signs of nausea, vomiting or blurred vision. *Id*.  Each time she was discharged home with a treatment plan. *Id*.  The Court finds that the ALJ gave proper weight to records from Westmoreland Hospital, including those from Dr. Plundo.

Furthermore, the Court finds that the extensive medical records evaluated by the ALJ from Plaintiff's other treating and examining physicians, including Dr. Sauter, Dr. Rutigliano, Dr. Toshok and Dr. Jozefczyk support the ALJ's residual functional capacity determination.

Records from Dr. Rutigliano indicated that Plaintiff had a "good" neurological examination post cervical fusion. (R. at 145).  He noted that Plaintiff had done well with back pain. (R. at 144).  He did note that Plaintiff suffered from headaches and treatment appeared to be without significant benefit in 2002. *Id*.  However, he referred Plaintiff to a pain management

specialist, Dr. Toshok, and indicated that, from his perspective, Plaintiff could work at a light or sedentary level. (R. at 143).

Dr. Toshok treated Plaintiff with Bextra for pain and recommended aqua therapy, which records indicate Plaintiff stopped after a few sessions. (R.at 151).  He noted moderate pain over her occipital nerve and generalized sensitivity. (R. at 166). He noted that nerve blocks provided temporary relief of her pain. *Id*.

Records from Dr. Sauter indicate that he cautioned Plaintiff as to her daily use of analgesic pain medications and recommended chronic antidepressant therapy for pain management instead. (R. at 195).  On examination, he found that her extraocular and hearing were intact and her motor power was 5/5 bilaterally. *Id*.

Records from an examining neurologist, Dr. Jozefczyk, indicate that, on examination in 2003 regarding Plaintiff's headache symptoms, she noted that Plaintiff had a full range of motion though she held her head rigidly. (R. at 157).  She also indicated that she saw no paravertebral muscle spasms. *Id*.  Dr. Jozefczyk indicated that she found no anatomical explanation for Plaintiff's headaches. *Id*. She opined that Plaintiff's symptoms were likely due to overuse of analgesic pain medications and recommended a pain control program with prophylactic medication and psychological support. *Id*.

Additionally, Plaintiff's subjective reports of daily activity, including her ability to go shopping, engage in household chores and activities, support his determination that her symptoms are not disabling. (R. at 558; 562; 564).

VI.    **CONCLUSION**

Because the ALJ's determination is supported by substantial evidence, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

An appropriate Order follows.

 s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

21

cc:    Karl E. Osterhout, Esquire
1789 South Braddock Avenue
Suite 570
Pittsburgh, PA 15218

Jessica Liebar Smolar
Assistant United States Attorney